IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CRYSTAL D. BAKER, | ) | 4:06CV3056 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

In this social security appeal, the plaintiff contends that the Commissioner's decision to deny her disability insurance benefits and supplemental security income is contrary to law and not supported by the evidence. After having carefully reviewed the record, I find that the Commissioner's decision should be affirmed.

## *I. BACKGROUND*

The plaintiff, Crystal Baker, applied for disability insurance benefits and supplemental security income in April 2003. Baker, who was then 44 years old, claimed that she had become disabled on August 28, 2002, because of rheumatoid arthritis. Baker was found "not disabled" in August 2003, and that finding was reaffirmed the following month on reconsideration.

An administrative hearing was held in August 2004. Testimony was provided by Baker, who was represented by counsel, and by a vocational expert under contract with the Social Security Administration. The administrative law judge (ALJ) issued an unfavorable decision in November 2004. The Appeals Council denied Baker's

request for further review on February 3, 2006.[1]  This action was timely filed on March 17, 2006.

### A.  Findings by the ALJ

The ALJ evaluated Baker's claims according to the five-step sequential analysis prescribed by the social security regulations.  See 20 C.F.R. §§ 404.1520 and 416.920.  Among other things, he found (1) that Baker had not engaged in any substantial gainful activity since August 28, 2002; (2) that Baker has medically determinable impairments consisting of rheumatoid arthritis and osteoarthritis affecting her hands and knees; (3) that while these impairments are "severe" under the regulations, they do not meet or equal one of the listed impairments under 20 C.F.R., Part 404, Subpart P, Appendix 1; (4) that Baker's impairments do not prevent her from performing her past relevant work as a restaurant supervisor; and (5) alternatively, that Baker retains the capacity to perform certain light, unskilled jobs which exist in significant numbers in the national and local economies.

### B.  Issues on Appeal

Baker requests that the Commissioner's decision be reversed and the case remanded for payment of benefits because:

1. The ALJ erred in determining that Baker could perform her past relevant work by failing to examine the functional demands of the work as she actually performed it.

---

[1] Baker's complaint alleges that the Appeals Council's denial was issued on February 3, 2005.  The Commissioner's answer alleges that the actual date was February 3, 2006, which I will assume to be correct.  Although the administrative record contains a "notice of Appeals Council action" dated February 3, 2006, that notice references Baker's "request for review of the Administrative Law Judge's decision dated July 27, 2001."  (Tr. 5.)  To the extent it may be questioned whether Baker exhausted her administrative remedies in this case, or whether her action is time-barred, I will treat such defenses as waived.

2. The ALJ erred in assessing Baker's residual functional capacity (RFC) by:

   a. Failing to consider the complete opinions of state-agency consulting and examining physicians;

   b. Giving little weight to a physical therapist's report; and

   c. Failing to develop the record by contacting Baker's treating physician for an opinion.

3. The ALJ's decision is not based on substantial evidence because he erred in:

   a. Failing to assess Baker's credibility in accordance with Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), and finding generally that Baker exaggerated her condition;

   b. Finding that Baker's treating physician had not ordered aggressive treatment;

   c. Failing to consider Baker's lack of financial resources as a reason for her not taking medicines or obtaining treatment;

   d.. Finding that Baker was exaggerating her condition and was not credible in reporting that she needed to lie down during the day; and

   e. Discrediting Baker's complaints based on her testimony that she cares for four dogs.

## II. DISCUSSION

A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001). "Substantial evidence" is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. Id., at 960-61; Prosch v. Apfel, 201 F.3d 1010, 1012

3

(8th Cir. 2000). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. See Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).

This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992). Issues of law are reviewed de novo. Olson v. Apfel, 170 F.3d 820, 822 (8th Cir. 1999); Boock v. Shalala, 48 F.3d 348, 351 n.2 (8th Cir. 1995); Smith, 982 F.2d at 311.

### *A. Past Relevant Employment*

Baker first argues that the ALJ erred in finding that her previous employment as a restaurant supervisor involved light work. I conclude that the ALJ's finding is supported by substantial evidence and is not contrary to law.

Baker worked at a fast food restaurant in Nebraska City between August 1995 and August 2002.[2] The restaurant operated as a Hardee's until 1997, when it became a Burger King. Baker states that she was a "cashier, supervisor" for Hardee's, which involved taking food orders and cash, cooking, ordering supplies, taking inventory, counting cash drawers, changing signs, wiping down tables and countertops, and sweeping and mopping floors. (Tr. 86.) She supervised 4 to 8 employees and had authority to hire and fire. (Id.) Baker states that twice a week she also had to unload a delivery truck and put away supplies, which involved frequent lifting of 25 pounds and occasional lifting of 50 pounds. (Tr. 86, 198.) While later working for Burger King, as a "cashier, team leader, cook", Baker only had to lift 10 pounds. (Tr. 87.) Her duties included taking orders, cooking and making sandwiches, wiping down

---

[2] Baker states that she started working at the restaurant either in May or June 1994 (Tr. 65, 77, 107), or else in August 1995 (Tr. 83). Her wage records suggest that the 1995 date is correct. (Tr. 61-62.)

4

tables, washing dishes, taking out trash, cleaning the parking lot, taking inventory, and supervising 3 to 8 employees when the manager was not available. (Id.)  Baker states that she worked only part-time at Burger King between August 2001 and August 2002, and no longer had any supervisory duties. (Tr. 83, 88, 107.)  Before going to work at the restaurant, Baker was a cashier in a grocery store for about a year. (Tr. 61, 83, 85.)  Before that, she worked in a factory. (Id.)

In Exhibit 10E, the vocational expert (VE) classified Baker's past jobs as "restaurant supervisor" (DOT 211.137-010),[3] "factory laborer" (DOT 706.687-010), and "cashier" (DOT 211.462-014), all of which involve light work.[4] (Tr. 110.)  When

---

[3] The Dictionary of Occupational Titles does not include a classification for a "restaurant supervisor".  DOT 211.137-010 ("supervisor, cashiers") applies to a person working at a hotel, restaurant, or retail establishment who:

> Supervises and coordinates activities of workers engaged in receiving cash or credit-card payment for merchandise or services and keeping records of funds received in retail establishments or places of public accommodation: Performs cashiering and other clerical duties to relieve subordinates during peak work periods. Searches records to assist subordinates in locating and reconciling posting errors on customers' invoices, such as hotel bills or sales tickets, or compares cash register totals with receipts in register to verify accuracy of transactions. Withdraws monies from bank and keeps custody of operating funds, or retains next day's operating funds from daily receipts. Allocates operating funds to cashiering stations. Totals and summarizes funds received, endorses checks, and prepares bank deposit slip. Performs duties as described under SUPERVISOR (clerical) Master Title.

Dictionary of Occupational Titles (4th ed. 1991).

[4] It is unclear whether the cashier designation was intended to apply to Baker's work at Burger King, or whether it was intended to apply to her work at the grocery store.  Baker did not mention the grocery store at the administrative hearing and, in fact, testified that she had only worked at the restaurant and the factory during the last 15 years. (Tr. 198-199.)  The VE heard this testimony but indicated that it did not change anything in Exhibit 10E. (Tr. 207.)  This suggests that the VE considered

5

the VE was asked a hypothetical question that entailed a person with limited use of the hands who could only "handle and finger . . . [on] an occasional basis," she testified that the person could not perform Baker's past work as a factory laborer or cashier, but could perform Baker's past work as a restaurant supervisor. (Tr. 208.) The ALJ relied on this testimony at step four to find that Baker was not disabled, stating:

> The vocational expert testified that the claimant's past relevant work as a restaurant supervisor (DOT #211.137-010) is a light, skilled occupation (Exhibit 10-E). The impartial vocational expert testified that, based upon the claimant's residual functional capacity, the claimant could return to her past relevant work as restaurant supervisor.

(Tr. 30.)

Baker complains that the VE's exhibit and testimony disregarded the fact that she unloaded a truck twice a week as part of her "supervisor" duties for Hardee's, which was medium work. See 20 C.F.R. §§ 404.1567(c) and 416.967(c) ("Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."). The ALJ determined that Baker's RFC only allows her to perform "light work with occasional stooping, crouching, crawling, kneeling and climbing activities." (Tr. 29.) "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b) and 416.967(b).

Baker quotes from Social Security Ruling 96-9pfor the proposition that "the ALJ must provide a 'function-by-function comparison with the functional demand of an individual's [past relevant work] as he or she actually performed it and then, if

---

Baker to be a "cashier" while working at Burger King. On the other hand, a cashier in a fast food restaurant is more properly classified under DOT 311.472-010 ("fast-foods worker") than under the classification that was used by the VE (which applies to a cashier in a "grocery, department, or other retail store"). For purposes of this appeal, it will be assumed that the ALJ found that Baker would be unable to perform her past work at Burger King.

necessary, as the work is generally performed in the national economy.'" [5] (Filing 14, at 8.) Baker apparently construes this language to mean that an ALJ is required in all cases to make an initial determination of whether the claimant has the capacity to do her past relevant work as she actually performed it. This is incorrect.

"Where the claimant has the residual functional capacity to do <u>either</u> the specific work previously done <u>or</u> the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled." <u>Lowe v. Apfel</u>, 226 F.3d 969, 973 (8th Cir. 2000) (emphasis supplied). <u>See</u> <u>also</u> <u>Barnett v. Barnhart</u>, 362 F.3d 1020, 1023 n.3 (8th Cir. 2004) (the ALJ may determine a claimant can perform the claimant's past occupation based on "[t]he functional demands and job duties of the occupation as generally required by employers throughout the national economy.") (quoting <u>Evans v. Shalala</u>, 21 F.3d 832, 833-34 (8th Cir.1994); S.S.R. 82-61); <u>Martin v. Sullivan</u>, 901 F.2d 650, 652 (8th Cir. 1990) (ALJ is not required to classify a claimant's past relevant work solely on the basis of the physical demands of the claimant's actual past work). To determine what a typical job description is in the "national economy", an ALJ may take notice of job information in the Dictionary of Occupational Titles. <u>Jones v. Chater</u>, 86 F.3d 823, 826 (8th Cir.1996) (citing <u>Evans</u>, 21 F.3d at 834; 20 C.F.R. § 404.1566(d)(1)). In doing so, however, the ALJ must be careful not to characterize the specific work a claimant performed too broadly by using a generic job description. <u>See</u> <u>id.</u>

Baker's only objection to the job description that the ALJ applied to her work at Hardee's is that it does not encompass her twice-weekly duty of unloading the supply truck. If this duty occupied a significant amount of her time on the job, she would have a valid point. The record does not show this to have been the case,

---

[5] The stated purpose of Social Security Ruling 96-9p is "[t]o explain the Social Security Administration's policies regarding the impact of a residual functional capacity (RFC) assessment for less than a full range of sedentary work on an individual's ability to do other work[,]" emphasizing, in particular, that "[i]f the performance of past relevant work is precluded by an RFC for less than the full range of sedentary work, consideration must still be given to whether there is other work in the national economy that the individual is able to do, considering age, education, and work experience." S.S.R. 96-9p, 1996 WL 374185 *1 (S.S.A. July 2, 1996). The ruling has no direct application to the facts of the present case.

7

though. In her written submission, when asked to explain "what you lifted, how far you carried it, and how often you did this[,]" Baker responded that "the lifting [and] carrying I did on this job was twice a [week] when truck came—put away 6-8 [cases] of fries, hash browns [illegible] containers anywhere from 2 ft. to 10 ft." (Tr. 86.) At the hearing she merely testified: "[At] Hardee's I just supervised. . . . I unloaded the truck and had eight people under me. . . . [I] took [food] orders." (Tr. 198.)

The ALJ did not make further inquiry, but it must be remembered that the claimant carries the burden through step four of establishing that she is unable to perform her past relevant work. See Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). Also, Baker made no objection to Exhibit 10E, the past relevant work summary prepared by the vocational expert, nor did she present any supplemental evidence to the Appeals Council to demonstrate that the "restaurant supervisor" designation was erroneous. Thus, even if it might be argued that the ALJ failed to develop the record fully with regard to assessing the physical demands of Baker's past employment, there is no showing that Baker was prejudiced by the ALJ's failure to ask follow-up questions about her truck unloading activities. See, e.g., Lacroix v. Barnhart, 465 F.3d 881, 886 & n. 2 (8th Cir. 2006) (finding that the claimant had failed to establish the prejudice necessary for a reversal due to failure to develop the record, and noting that the fact that the claimant was represented by an attorney in the proceedings before the ALJ was relevant to the prejudice inquiry).

In summary, the ALJ's finding that Baker's past relevant employment includes light work as a restaurant supervisor is supported by substantial evidence and is not contrary to law. The mere fact that Baker unloaded the restaurant's supply truck in addition to performing her supervisor duties does not invalidate the ALJ's finding that she remains capable of working as a restaurant supervisor, at least as that job is generally performed in the national economy.

Even if there was some error made at step four of the disability analysis regarding the physical requirements of Baker's past relevant employment, the ALJ made an alternative step-5 finding that Baker is able to perform other light jobs that exist in significant numbers in the national and local economies. Baker does not challenge this finding except insofar as she claims that it is based on a faulty RFC assessment. I will consider that argument next.

### *B. Residual Functional Capacity*

The ALJ found that Baker "can do light work with occasional stooping, crouching, crawling, kneeling and climbing activities[,]" that "on a sustained basis [she] should be limited to occasional bending and fingering[,] and that she should avoid extreme heat, cold, vibration, work at heights, around dangerous machinery, or with automotive equipment." (Tr. 29.) For purposes of the step-5 analysis, the ALJ also assumed that Baker was only able to walk or stand for 4 hours out of an 8-hour workday. (Tr. 30, 208-09.) The VE testified that a person with these limitations could find work as a surveillance systems monitor (DOT 376.367-018) or counter clerk (DOT 279.357-062). (Tr. 30, 209-10.)

Baker complains that the ALJ ignored certain other limitations that a state-agency consulting physician included in an RFC assessment that was completed on August 14, 2003, following a review of her medical records and the results of a physical exam conducted by another state-agency physician on June 11, 2003. Specifically, the consulting physician opined that Baker should not climb ladders, ropes, or scaffolds. (Tr. 148.) Because surveillance system monitors and counter clerks do not regularly engage in these climbing activities, their omission cannot constitute reversible error.

Baker also complains that the ALJ ignored an opinion rendered by the state-agency examining physician, that she "probably has decreased work capacity due to pain and stiffness, which increases with activity." (Tr. 134.) This opinion is not specifically discussed by the ALJ, but neither is it inconsistent with the ALJ's finding that Baker is only able to perform less than a full range of light work. The state-agency consulting physician did take note of the examining physician's report that Baker had "some pain and stiffness," but his RFC assessment was no more restrictive than the ALJ's. In fact, the ALJ allowed for an additional limitation on the number of hours that Baker could stand or walk during a workday. I find no error in the ALJ's handling of the examining physician's opinion.

Baker claims that the ALJ also ignored findings made by a physical therapist, and argues that the regulations require that consideration be given to every medical opinion received, regardless of its source." See 20 C.F.R. §§ 404.1527(d) and

9

416.927(d). Actually, a therapist's opinion, standing alone, does not qualify as a "medical opinion" because a therapist is not an "acceptable medical source". See Lacroix, 465 F.3d at 885-86 (citing 20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)). A therapist's opinion is still relevant evidence, however, and, in an appropriate case, may even outweigh the opinion of an "acceptable medical source", including the medical opinion of a treating source. See S.S.R. 06-03p, 2006 WL 2329939 *5 (S.S.A. Aug. 9, 2006); 20 C.F.R. §§ 404.1513(d) and 416.913(d).

In the present case, the physical therapist saw Baker only one time, on July 10, 2003, for an evaluation requested by the state agency. The therapist concluded that Baker "has generalized weakness in her upper and lower extremities including grip and pinch strength[,]" that "[h]er weakness and subjective reports of pain in fingers, wrists, shoulders, knees, and feet moderately limit her overall ability to function[,]" and that "[h]er fine motor skills are moderately impaired due to her arthritis and lack of strength." (Tr. 140.) The ALJ stated that he was giving the therapist's report "little weight because a physical therapist rather than a doctor conducted the examination . . . [and] the range of motion and muscle weakness noted are subject to voluntary limitation and the findings are out of proportion to the findings of doctors both before and after this examination." (Tr. 28.) I cannot say this was error.

The opinions of physical therapists and other health care providers who are not "acceptable medical sources" are "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file[,] but "[t]he weight to which such evidence may be entitled will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors." S.S.R. 06-03p, 2006 WL 2329939 at *3-4. "Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." Id. at *6. The ALJ's decision in this case was issued prior to Social Security Ruling 06-03p, but it fully complies with the ruling by explaining reasons why the ALJ concluded that the therapist's report was

10

entitled to little weight. Moreover, it is not apparent that the therapist's opinions regarding Baker's "moderate" limitations, even if assigned greater weight, would change the outcome of this case.

Baker also contends that the ALJ was required to obtain an opinion from her treating physician, a rheumatologist, with respect to her work-related abilities. In Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000), the Court of Appeals held that it was reversible error for the ALJ to rely solely on the opinions of non-treating, non-examining physicians who had reviewed the reports of treating physicians to form an opinion of the claimant's RFC. This holding has been declared inapposite, however, where, as in this case, the claimant has failed to carry her burden at step four of establishing that she is unable to do past relevant work. See Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).

If the ALJ's alternative step-5 finding must be considered, I also conclude that Nevland is distinguishable from the present case because the medical records that were reviewed by the state-agency consulting physician were not confined to Baker's treatment records, but also included the results of a detailed physical exam that was conducted recently by another state-agency physician. Furthermore, there is little in the record to indicate that Baker's treating physician would have opined that her RFC was any more restrictive. There is a report from March 2001 in which the doctor stated that he was supporting an earlier application by Baker for disability insurance benefits "[d]ue to her disease, her financial state, and her inability to work fulltime" [6] (Tr. 125), but subsequent reports indicate that her condition improved. In October 2001, the doctor reported that "Baker's rheumatoid arthritis objectively looks very well" and that "[s]he has no synovitis, no limitation in motion." (Tr. 124.) He noted that Baker had withdrawn her disability application and returned to work at Burger King, and he commented, "I think she is better[.]" (Id.) Similarly, in April 2002, the

---

[6] "Treating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant cannot be gainfully employed, because they are merely 'opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner].'" Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir.2002)).

11

doctor reported that "Baker's rheumatoid arthritis objectively looks great" and that her knees "are the only joints that have any kind of even remote swelling[.]" (Tr. 113.) On August 27, 2002, one day before the alleged onset of disability, he reported that "Baker objectively looks wonderful in reference to her rheumatoid arthritis" and that "[s]he has no synovitis whatsoever and all joints move well." (Tr. 112.) The doctor did not see Baker again until December 30, 2003, at which time he commented upon "how well she looks today[.]" (Tr. 160.) "Her joints showed subluxation of the right second MCP joint and left first MCP with trace synovitis of those two joints and that's about it. She had mild ulnar drift of her right hand. Her toes showed osteoarthritis of the first MTP joints with no real synovitis there. Her large joints looked normal. She had no lymphadenopathy." (Id.) These findings are essentially the same as the findings that had been made by the state-agency examining physician six months earlier, namely, that Baker had "some synovial thickening and swelling of the first and second MCP on both hands" and "some swelling" on "the right large toe . . . as well [as] at the MTP joint." (Tr. 133.) Under these circumstances, the ALJ's alleged failure to develop the record by requesting an RFC assessment from Baker's treating physician is, at most, harmless error. Reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial. See Haley v. Massanari, 258 F.3d 742, 750 (8th Cir. 2001); Onstad v. Shalala, 999 F.2d 1232, 1233 (8th Cir. 1993).

Finally, Baker advances several arguments as to why the ALJ allegedly erred in discounting her subjective complaints of pain and alleged physical limitations. I find no merit to any of them.

Baker first argues that the ALJ failed to consider all of the Polaski factors.[7] Although the ALJ does not specifically reference Polaski in his decision, he does cite to Social Security Ruling 96-7p and to 20 C.F.R. §§ 404.1529 and 416.929, which govern the credibility assessment and which identify the same factors as the Court of

---

[7] To assess a claimant's credibility, the ALJ must consider all of the evidence, including prior work records and observations by third parties and doctors regarding daily activities, the duration, frequency, and intensity of pain, precipitating and aggravating factors, the dosage, effectiveness, and side effects of medication, and functional restrictions. Lowe v. Apfel, 226 F.3d 969, 971-72 (8th Cir. 2000) (citing Polaski).

Appeals did in Polaski. More importantly, it is apparent that the ALJ has applied those factors in his rendering his decision. The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered. See Pelkey v. Barnhart, 433 F.3d 575, 578 (8th Cir. 2006); Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996) (ALJ's failure to discuss each Polaski factor in a methodical fashion, while an arguable deficiency in opinion-writing technique, probably had no practical effect on the outcome of the case). Baker complains, in particular, that the ALJ failed to consider either her prior work record or her medications. I disagree. The ALJ specifically noted that Baker "returned to work after her first application [for disability insurance benefits] was denied in August 2000[,]" and that "[s]he apparently filed and withdrew another application in 2001 and returned to work." (Tr. 29.) While Baker views this evidence as only enhancing her credibility, the ALJ, not illogically, reached a different conclusion. The ALJ also noted that "[f]or a year and a half after the alleged [disability] onset, [Baker] failed to return to her treating rheumatologist or to continue with her medications" and afterwards had "seen a doctor only once, on July 27, 2004[.]" (Id.) The ALJ also stated that "[t]he records show that [Baker's] conditions are fairly controlled with routine treatment" and concluded that "[i]t is reasonable to assume that, if [Baker] were as disabled as she claims, her doctor would have ordered more aggressive treatment." (Id.) Again, this seems to me a logical conclusion.

Baker takes issue with the ALJ's statement regarding the lack of aggressive treatment, and notes that her rheumatologist reported on March 9, 2001, that "she has significant rheumatoid arthritis requiring quite agressive therapy with her Naprosyn 50 mg b.i.d., 15 mg of methotrexate a week, Arava 200 mg daily, 5 mg of prednisone a day, and folic acid." (Tr. 125.) The ALJ's point, however, is that when Baker last saw her doctor, on December 30, 2003, after she had gone without treatment for nearly a year and a half, the doctor decided not to resume all of her medications. "[I]n vew of how well she looks[,]" the doctor eliminated Baker's Arava prescription and "chose to put her only on the methotrexate at 15 mg. a week along with 4 mg. of folic acid a day . . . and [he] resumed her naproxen 500 mg b.i.d. and 5 mg. of prednisone if the other medicines are not effective." (Tr. 160.) In any event, "[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling." Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (quoting Roth v. Shalala, 45 F.3d 279, 282 (8th Cir.1995)).

Baker also criticizes the ALJ for failing to take her lack of financial resources into account, and she points to the December 2003 report from her rheumatologist which recites that "[f]or the last year [Baker] has been out of her medicine since she has been off any insurance assistance and she is not able to qualify for Medicaid until she became totally impoverished." (Tr. 160.) "[A] lack of sufficient financial resources to follow prescribed treatment to remedy a disabling impairment may be . . . an independent basis for finding justifiable cause for noncompliance [with prescribed treatment]." Id. (quoting Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984)). Perhaps the ALJ should have discussed this factor in connection with his finding that Baker "has not been consistent in treating with her rheumatologist" (Tr. 29), but his failure to do so does not require reversal because Baker's noncompliance during 2003 was only part of the reason why the ALJ determined that she was not credible. Further, the record only suggests that Baker did not have insurance during 2003 and did not qualify for Medicaid assistance; Baker "offered no testimony or other evidence that she had been denied further treatment or access to prescription pain medicine on account of financial constraints." Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994) (affirming ALJ's finding that claimant was noncompliant). As the Commissioner also notes, the evidence shows that Baker continued smoking a pack of cigarettes daily. (Tr. 206.) See Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (while plaintiff claimed he could not afford prescription medicine, there was no evidence to suggest that he sought any treatment offered to indigents or chose to forgo smoking cigarettes to help finance pain medication).

The ALJ concluded that Baker "exaggerated her condition" in stating "that she can lift only one gallon and stand or walk only 10 minutes at a time" and also in "report[ing] lying down three-to-five times a day." (Tr. 29.) Baker argues that no treating source has opined that she is exaggerating, and specifically notes that her doctor stated in March 2001 that "[f]atique is an issue for her, as you frequently see in patients with rheumatoid arthritis." (Tr. 125.) However, there is no evidence that Baker's doctor ever directed her to limit her physical activities or to lie down during the day. See, e.g., Tucker v. Barnhart, 363 F.3d 781 (8th Cir. 2004) (claimant's credibility called into question where his treating physicians did not place any restrictions on him despite the alleged severity of back and leg pain). Also, as discussed above, the doctor found that Baker's condition improved significantly after

14

March 2001.[8] The ALJ did not entirely ignore Baker's subjective complaints, but instead balanced those complaints against the objective medical evidence to arrive at an RFC that included limitations on her ability to use her hands and to stand or walk for prolonged periods.

Finally, the ALJ stated that Baker "testified that she does not shop or drive, but cares for her four dogs." (Tr. 29) Although Baker complains that her ability to care for 4 dogs does not demonstrate that she is able to work full-time, the ALJ is required to consider her daily activities under the applicable regulations. See Polaski, 739 F.2d at 1322. I conclude that the ALJ did not place undue emphasis upon this factor; rather, it was only one of many reasons for finding that Baker's complaints of pain were not fully credible.

### III. CONCLUSION

For the reasons stated, I find that the Commissioner's decision is supported by substantial evidence on the record as a whole and is not contrary to law.

Accordingly,

IT IS ORDERED that the decision of the Commissioner is affirmed.

December 27, 2006.                    BY THE COURT:

                                      s/ *Richard G. Kopf*
                                      United States District Judge

---

[8] Whereas in March 2001 Baker reported "morning stiffness lasting at least until Noon and frequently all day" and "[f]requent swelling . . . in her hands, feet, and to a lesser extent her knees" (Tr. 125), in August 2002 she only complained of having "a few minutes of morning stiffness, sometime up to about 2 hours, with most of that in her knees." (Tr. 112.) In December 2003 Baker reported to her doctor that "[m]orning stiffness is lasting all day and she claim[ed] swelling and pain in her hands and feet" (Tr. 160), but she also told him that she had not been taking any medicine for a year.